Wilson, J.,
delivered the opinion of the court.
The St. Joe and Mineral Farm Consolidated Mining Company, one of the defendants, was a corporation organized under the laws of Colorado for the principal object of acquiring, buying, leasing, purchasing and locating mines and mining property, and selling and operating them. Its business *341 was managed by a board of five directors, and its capital stock was $2,000,000, divided into 2,000,000 shares. On September 17, 1891, the company had acquired some interest in what was known as the Mineral Farm mining property in Pitkin county, and had agreements to purchase all of the remaining interests except one forty-eighth, deeds therefor being then in escrow subject to delivery on payment of $37,500. The company had in addition a floating indebtedness of about $11,000. The officers of the company were endeavoring to raise the money by a sale of treasury stock, to pay off this indebtedness, and purchase these outstanding interests. To accomplish this, on September 19, 1891, the company through its board of directors formally entered into an agreement with defendant B. Clark Wheeler whereby he was to advance sufficient funds to meet said indebtedness and payments as they became due, and the further sum of about $7,718 to be applied to the working of the property.' As a consideration therefor, he was to receive 762,500 shares of the capital stock of the company. Wheeler was also to be made a director and president of the company. At a subsequent meeting of the directors, held on September 23,1891, before Wheeler had become president, lie was by formal resolution appointed the company’s agent “ with power to look after the general business of the company, approve bonds, direct the execution of work, contract for same, audit and pass on bills, purchase machinery, negotiate for the payment of options, escrows and other obligations against the said company,” and negotiate with the owner of the one forty-eighth interest “ and others for interests in the Mineral Farm owned by them.” Subsequently, Wheeler was made a director and president as agreed. On May 6, 1892, at a meeting of the directors, Wheeler and two others constituting a majority of the board being present, the following resolution was adopted: “ Resolved, that the manager of the company is hereby authorized to negotiate a loan of forty thousand ($40,000) dollars, at twelve per cent, per annum interest, to pay up the present indebtedness of the company, amounting *342 in the neighborhood, of $29,000 ; and to get the further sum of $11,000 for development purposes, the loan to be made for one year; and to give a lien on three fourths interest of the Mineral Farm as security, and that the president and secretary are hereby authorized to execute the necessary papers for effecting the loan.” On May 10, following, in pursuance of this authority, it is claimed the following note was executed, to wit:
“$40,000. Aspen, Colorado, May 10, 1892.
“ One year after date, we promise to pay to the order of The Continental Divide Mining Investment Company, forty thousand ($40,000) dollars, with interest at the rate of one per cent, per month, payable at maturity, until paid, and 2| per cent, attorneys’ fees if not paid at maturity.
“ This note is secured by trust deed on three-fourths Mineral Farm, of this date. Value received.
(Signed) “ The St. Joe & Mineral Farm Consolidated Mining Company,
“ By B. Clark Wheeler, President.
“E. W. Young, Secretary.”
On the same date and by the same officers, a deed of trust was executed to one Aaron Heims, trustee, conveying to him three-fourths interest in the Mineral Farm property to secure the payment of the note.
■It is admitted that at this time defendant Wheeler was also president of The Continental Divide Mining Investment Company, the payee in the note. Within a short time thereafter, at a date not definitely fixed, but long before its maturity, the note was indorsed by the payee by Wheeler as president, and A. J. Peck as secretary, and delivered to J. B. Wheeler & Company, bankers at Aspen, as collateral to secure a debt of defendant Wheeler previously existing, and an additional loan which he desired to secure. At a subsequent date, not definitely fixed, the following indorsement was placed upon the note :
*343 “ This note extended one year from maturity.
“ The Continental Divide Mining Investment Company,
“ B. Clabk Wheeleb, President.”
Afterwards a corporation known as The J. B. Wheeler Banking Company was formed, and to it J. B. Wheeler & Company sold, assigned and transferred all of their assets, including the individual notes of defendant Wheeler and the note in question held as collateral therefor. In 1893, this banking company made an assignment to one Ferris. On May 11,1894, the assignee sold, delivered and assigned to plaintiff, the First National Bank of Aspen, the transaction being conducted by Lyster, cashier, the notes of defendant Wheeler, together with the collateral held by him. The assignee received for this transfer the full sum of defendant Wheeler’s indebtedness, amounting with interest to about $34,000. The plaintiff bank then purchased from defendant Wheeler his equity in the $40,000 collateral note, and became thereby its full and absolute owner.
On May 14, 1893, at a meeting of the directors of the defendant company, a resolution was adopted, reciting the purchase of tins note by Lyster, and directing that for the purpose of making payments on the same, the royalties to become due to the company under a certain lease should be assigned to Lyster.
At a meeting of the directors held on December 18, 1893, at which four directors were present, a resolution was offered to the effect that the company refuse to recognize the validity of the note, and directing an action to be brought immediately to cancel it and the trust deed given to secure its payment. The resolution did not receive a second and failed to pass. Thereafter, during the course of the same meeting, a resolution was adopted, three directors voting therefor, whereby it was declared that the note and deed of trust were evidence of a real and bona fide indebtedness of the company, and that the action of the officers of the company in issuing and *344 delivering them was approved, ratified and confirmed. A short time previous to this, in October, 1893, J. J. Hagerman had brought suit for himself and other stockholders of the company like situate against the directors, joining with them The Continental Divide Company, The Wheeler Banking Company, and Ferris, assignee, the then holder of the note, alleging, among other tilings, that the note was without consideration and had been executed by defendant Wheeler for the purpose of defrauding the company, and praying that they be restrained from mailing payment thereon. This suit appears to have been dismissed within a few months after its institution.
Differences resulting in several lawsuits having arisen between J. J. Hagerman and R. J. Bolles, large stockholders in the company, on the one side, and the defendant Wheeler on the other, as to the management of the affairs of the company, on June 7, 1894, a formal agreement in writing was entered into by these three parties for the adjustment and settlement of these differences. In this it was agreed, among other tilings, that a new board of directors should be elected of which Hagerman and Bolles should have the selection of the mar jority, that defendant Wheeler should remain a director for the period of ninety days only, that he should transfer to said Hagerman and Bolles 600,000 shares of his stock in the St. Joe company, purchased by them at trustee’s sale, and also that the contract with Lyster for the receipt by him of royalties and their application on this note, should remain undisturbed. In pursuance of this, the stock was transferred by defendant Wheeler, a new board of directors was elected, and Hagerman became president of the company and remained so thereafter. Subsequently, under the statute, the St. Joe company consolidated with several other mining companies and formed a corporation known as The Mineral Farm Consolidated Mining Company, one of the defendants, which thereby succeeded to the liabilities, debts and obligations of the St. Joe company.
On April 10,1895, plaintiff commenced this suit to secure *345 the appointment of a successor in trust to enforce the provisions of the deed of trust given to secure the payment of the note, it being alleged that the trustee named therein had removed from the state. The St. Joe company and The Mineral Farm Consolidated Company being the real parties in interest, answered and denied the validity of the note and of the deed of trust, alleging that they were fraudulently executed by defendant Wheeler without authority and without consideration; and that plaintiff and the other transferees of the note had notice of these facts. They also filed a cross-complaint in which they assailed -the validity of the .note upon substantially the same grounds set up hi their answer, and sought an affirmative decree declaring both note and trust deed to be void and directing them to be delivered up to them for cancellation. Plaintiff replied, denying all of the material allegations of the answer and cross-complaint, and setting up various matters which it is claimed would operate as an estoppel on the defendants to deny the execution or validity of the note or deed. Upon trial, the findings of the court and the decree were in favor of the plaintiff, and from this the defendant corporations appeal.
In the view which we take of this case, after a thorough and critical examination of the record, which is unusually voluminous, the main questions involved are those of fact. There are, however, some propositions of law presented which necessarily require our consideration. It is insisted by defendants that at the time of the execution of the note The Continental Divide Mining Investment Company was not the owner or possessor of any money or propertjr of any value; that defendant Wheeler was its president, had sole supervision and control of its affairs, owned all of its capital stock, if any was ever issued, that he used the name of the company in the transaction of his own private business, and that it did not lend to the St. Joe company any móney upon or in consideration of the note. It is also denied that the defendant company was in debt at that time to the extent of $29,000, or to any considerable extent, but it is alleged that *346 if any indebtedness then existed, it was due and owing wholly to defendant Wheeler and not to other parties as claimed. It is therefore contended that the defendant, Wheeler, was the sole beneficiary of. the note, and this being the case, it is vigorously urged that the execution of the note and deed of trust was void, because of being.against public policy. To quote the vigorous language of counsel, “The rule of law is that a contract between directors and their company for their own interest is void if the company seeks to evade it. The contract remains void because it is against public policy. It cannot be galvanized into life by anything which the company may do, no matter what the good faith of the directors was.” The statement seems to be somewhat inconsistent in itself, but as we understand its intended meaning from the argument in support of it, we cannot assent to the broad proposition here asserted. To affirm it would be to establish a principle that would subject to disastrous consequences most important business enterprises, and stamp as fraudulent the most innocent transactions. The better rule and one that is supported by the great weight of authority, is aptly expressed by Mr. Thompson in his commentaries on the Law of Corporations, § 4068. “ The strict rule that directors cannot enter into contracts with the corporation does not seem to be practicable. It would operate to disable those who have already embarked their funds in a corporate enterprise, and given to it their personal attention, from assisting it in time of difficulty, except at the risk of doing so without security. A corporation might be in a sorry plight indeed if one who had already embarked his funds in it, and who from the fact of his being one of its managers, is best acquainted with its needs and difficulties, should not be able to make a present advance of money to it, and help it out of those difficulties. That it is necessary for the law to throw around such transactions the strongest safeguards in order to prevent fraud, need not be argued. * * * We therefore find the prevailing doctrine to be that the director of a corporation may advance money to it, may be *347 come its creditor, may take from it a mortgage or other security, and may enforce the same like any other creditor, but always subject to severe scrutiny, and under the obligation of acting in the utmost good faith.” The learned author cites a large number of cases from the federal courts, and also from the various states of the union in support of the rule. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587; Beach v. Miller, 130 Ill. 163; Hallam v. The Indianola Hotel Co. et al., 56 Ia. 178; Mullanphy Savings Bank v. Schott, 135 Ill. 655; Borland v. Haven et al., 37 Fed. Rep. 395; Bank Comrs. v. St. Lawrence Bank et al., 8 Barb. (N. Y.) 436.
The same doctrine has, however, been expressly announced by this court. In West v. Hanson Produce Co., 6 Colo. App. 472, the court said: “ The great weight of modern authority is to the effect that as individuals the officers of the corporation can loan it money, or legally in any other proper way become its creditors and settle with it in the same manner as with an outsider. If such is the law, — and it seems to be where there is no statutory prohibition, — it logically follows-that the right to become a creditor carries with it all the rights of a creditor.”
It follows, therefore, that admitting the payee in the note to have been merely the representative, — the alter ego, — of defendant Wheeler, the note was not invalid solely on that account. On the contrary, it was a valid obligation, if a valid indebtedness to Wheeler existed so as to furnish the necessary consideration.
It is contended that the note appeared upon its face to be executed by a corporation and to a corporation of both of which the same person was president, and that this was sufficient notice to put J. B. Wheeler & Company and each subsequent transferee upon inquiry as to all matters affecting its validity. This could be urged with more force if the president had alone executed the note and had alone indorsed it, but this is not true. The secretaries of the respective companies joined with him in the execution and indorsement, and they were different individuals. In any event, the argu *348 ment depends for its force upon the theory that where a note is executed by one corporation to another, and the same person is president of both, it is prima facie void. These premises are not correct, and the argument therefore falls to the ground. However much such a circumstance may render it obligatory upon a court to scrutinize closely the bona fides of a transaction in certain cases, it by no means follows that it creates a presumption as to the invalidity of the paper either as to want of authority to execute it, or of consideration. It is elementary that as to a negotiable promissory note the legal presumption is that a valid and adequate consideration was given for it. Edwards, Bills, Notes, etc., §439; Randolph, Commercial Paper, § 178. The same presumption prevails in favor of its lawful execution by a corporation, which has the power to issue it. Randolph, Commercial Paper, § 335. Corporations so situated have an undoubted legal right to deal with each other, and although their contracts and agreements may be attacked and set aside in a court of equity, it is first necessary to show that some unconscionable advantage was taken of one by the other, or that a fraud was perpetrated upon one by virtue of the same party being president of both. Until this appears, the two having a right to deal with each other, the presumption will be in favor of the legality and fairness of the transaction. Thompson, Corporations, §4079, et seq. Especially does this presumption prevail where the transaction involves the issuance of a negotiable promissory note, and the rights of third parties.
Upon the subject of constructive notice and duty of inquiry arising from suspicious circumstances, the supreme court of Colorado has expressed itself very plainly, and laid down the rule which is binding upon the courts of this state. In Merchants’ Bank v. McClelland, 9 Colo. 610, it said: “If there is nothing upon the face of a negotiable instrument or in the indorsement or assignment to notify the assignee that the instrument was originally given upon an illegal consideration (gambling debts excepted), or obtained through fraud, the assignee who pays value therefor, and takes the same in *349 good faith before maturity, may recover as against the maker. This is true even though such assignee be in possession of facts or circumstances sufficient to arouse suspicion in the mind of a person of ordinary prudence, and though he is guilty of negligence in not first following up such information for the purpose of discovering the fraud or illegality to which the suspicious circumstances may seem to point. The latter part of this rule is not wholly unquestioned. Such able courts as that of Massachusetts deny its correctness; but we think it is supported by the better reason, as well as the great preponderance of authority. It is founded upon commercial necessity. The untrammeled circulation of these instruments is a matter of supreme importance in the vast field of commercial transactions. Drafts, bills of exchange, and other negotiable instruments take the place of money, and circulate almost as freely. To hold that each assignee must before accepting them inquire into each and every suspicious circumstance bearing upon the original execution or pointing to possible defenses in a suit between the original parties, would produce serious inconvenience to the commercial world.” This case was subsequently approved in Coors v. Bank, 14 Colo. 210, and has been followed by this court in Tourtelotte v. Brown, 1 Colo. App. 417, and Rand v. Pantagraph Stationery Co., 1 Colo. App. 270. The note did not disclose any suggestion that the maker was without authority to make it, or that it was for the benefit of any one of the officers making it. Even if the contention of defendants is well founded, the transferee could have been put upon inquiry only as to the right of defendant Wheeler to hypothecate this note as security for his own indebtedness as against the rights of the payee, The Continental Divide Mining Investment Company, of which he was president. In other words, the only inquiry upon which they could have been put was as to whether the transfer of the note to Wheeler by the payee was valid. The payee company alone could complain of defendant Wheeler’s want of authority or fraudulent action in this regard, and an inquiry, however it resulted, would not avail anything to the defendant companies.
*350 Suppose, however, that sufficient did appear at the time when Mr. Lyster purchased the note to put him upon inquiry as contended, what would he have found after the most thorough investigation ? Surely it will not be claimed that in making this inquiry he would have been required to go to each individual stockholder and interrogate him as to the validity of the note. Such a requirement would have been unreasonable, and compliance possibly impossible. It does not appear that he was a stockholder himself, and the fair presumption is that he could not have secured a list of the stockholders. He could reasonably have been expected to make inquiry only from the executive officers of the company. As these were the parties who executed the note, they would undoubtedly have affirmed its validity. They had already done so by their written indorsements. In case he had carried his investigation further, and been permitted an examination of the books of the company, although not a stockholder, he would have found, entered upon the minutes of the company, the proceedings of a meeting of the board of directors, regularly called and held so far as appeared upon the face of the record, and the resolution of May 6, perfect and regular upon its face, authorizing the negotiation of the loan, and which was the basis of the note. He would have also found in the minutes of the proceedings at a meeting of the directors on December 18, 1893, more than eighteen months after the note had been first issued, a resolution expressly naming and describing the note and the deed of trust given to secure it, reaffirming and declaring both to be valid and subsisting evidences of indebtedness of the company, and ratifying and confirming the acts of the officers in executing them.
The defendant companies further urge that notwithstanding the indorsement on the back of the note extending the time of payment for one year from maturity, all transferees of the note who took it subsequent to the time of maturity as originally expressed in the note, took it subject to such equities as the maker might have against it. In support of *351 this sweeping proposition, we are cited to only one authority, Dryer v. Mercantile Co. This case was decided by the Missouri court of appeals, but is unreported in the public reports, and the only reference to it "which can therein be found is in appendix to Vol. 4, Mo. App. Reports, which purports to give only the points decided, or syllabi, of unreported cases. The point there laid down as having been decided by the court was, “ "Where the time of payment of a negotiable note is extended by agreement, a reference to which is indorsed upon the back, one who takes it after its original maturity will be subject to all equities between the parties.” None of the facts are given, nor is the argument of the court, and we are forced to conclude that the case was one within which the agreement for extension had been made subsequent to the maturity of the note. Any other conclusion would tend to place this decision without the line of general and accepted authority, and to leave it unsupported by sound reasoning. In the case at bar, the indorsement of extension was not dated, and the legal presumption is, therefore, that it was made prior to the maturity of the paper. In the case of an assignment of. a note by indorsement, the legal presumption is unquestioned that it was made prior to maturity. The burden of proof lies upon him who alleges the assignment to have been made after maturity. 2 Randolph, Commercial Paper, § 686; 2 Parsons, Notes and Bills, page 9. In Rangor v. Cary, 1 Metc. 369, it was said: “ A negotiable note being offered in evidence duly indorsed, the legal presumption is that such indorsement was made at the date of the note, or at least antecedently to its becoming due ; and if the defendant would avail himself of any defense that would be open to him only in case the note was negotiated after it was dishonored, it is incumbent on him to show that the indorsement was in fact made after the note was overdue.” The reason upon which the rule is founded is that the presumption is raised by law with the view of facilitating the unobstructed circulation of commercial paper. The same reasoning applies with equal force to undated agreements extending *352 the time of payment. The indorsement in this case raised, in our opinion, a legal presumption that it was -before the original maturity and upon a sufficient consideration, and this would prevail until it was rebutted by some evidence, and this was not done. This being the case, therefore, it must be held that the note did not mature until three days after the 10th day of May, 1894. The indorsement must be considered as having been incorporated into the note, and made a part of it. Sagory v. Metropolitan Bank, 42 La. Ann. 629; Goodpaster v. Vorsi, 8 Iowa, 334.
The plaintiff therefore acquired the note free from equities which would have attached to it if he had acquired it after maturity.
Defendants assign error in a few instances both on the admission and exclusion by the court of certain testimony. We cannot see where any such action was prejudicial error, if error at all. The court seems to have been exceedingly liberal, there being no jury, in permitting both parties to offer for its consideration anything which they thought would even remotely tend to throw light upon the subject in controversy. In the few instances where it refused to permit some questions to be answered, it seems to have been correct in its ruling, or at least, the refusal was not as to material matters, and did not tend to injure the objecting party.
As to whether or not at the time of the execution of the note, the company was indebted as recited in the resolution of May 6, 1892, and whether the company received full consideration for the note, these and other incidental questions assailing the validity of the note are matters of fact, which were submitted to the court upon the evidence, and are covered by its findings. We would be justified under repeated decisions of this court, and of the supreme court of this state, in refusing to disturb these findings, or even review the evidence upon which they were based, solely upon the ground that the bill of exceptions does not contain all of the evidence presented at the trial. On account, however, of the *353 important interests involved in this suit, we have carefully-read all of the evidence presented, and prefer to base our refusal upon the rule, equally well established, that in a case where the evidence is conflicting, this court will not disturb the findings of the trial court where there is sufficient evidence to support them, unless they are manifestly against the weight of the evidence. The importance of this rule is strikingly exemplified by this case. In many instances, the evidence in support of a material point consists solely of the testimony of a single witness, and the evidence which is relied upon to overthrow it, consists also of the testimony of only a single witness. In such case, the trial judge before whom these witnesses personally appeared, and who had the advantage of seeing their conduct, appearance and manner upon the witness stand, was far better qualified than we to determine upon whose testimony it was safer to place reliance. It is sufficient to say that amply sufficient evidence appears to support the findings of the court upon all questions of fact, and they will not be disturbed.
The view which we have taken of this case obviates the necessity of considering the points raised by plaintiff as to ratification, estoppel, etc., and discussed by counsel in elaborate arguments.
There being no material error, the judgment and decree will be affirmed.

Affirmed.

Bissell, J., not'sittiiig.